**Dixie ADAIR, Plaintiff,**

v.

**BEECH AIRCRAFT CORPORATION, Defendant.**

No. 90–1003–K.

United States District Court, D. Kansas.

Jan. 28, 1992.

William L. Fry, Wichita, Kan., for plaintiff.

Terry L. Mann, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for defendant.

MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This is a civil rights action. Plaintiff Dixie Adair is a female commercial spare parts analyst in defendant Beech Aircraft Corporation's (Beech) inventory control department 152, a division of the company's product marketing section. Pursuant to Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., plaintiff seeks statutory relief for alleged discriminatory practices in the workplace.

In a summary way, Adair claims that on March 1, 1988, given her seniority by reason of the fact she had been employed as an analyst within the department since June 10, 1963, and her past performance and experience, she was best qualified to be upgraded to the position of group leader, whose role is to coordinate the activities of several analysts. Mr. Chuck Berry, a male analyst of lesser seniority, having been employed within the department only since 1975 and having less experience and a lower performance rating, was upgraded to the position of group leader. Adair claims this decision was gender based.

Additionally, Adair asserts further acts of sexual discriminatory practice, primarily retaliation, occurred in September of 1989 when she was not promoted to group leader. Adair claims she was not promoted to group leader in this instance because she had timely and formally complained of the foregoing alleged discriminatory practice to the Kansas Commission on Civil Rights.[1]

It developed that once Berry, a male analyst, was upgraded to the group leader position, he was readily advanced to the role of assistant manager. This promotion created a new vacancy for the group leader position. Adair held seniority over any other prospect to be considered. This time, Charlene Montgomery, a person with alleged lesser qualifications, was advanced to the position.[2]

Beech denies that any employment decisions were related to Adair's sex, or that it has retaliated against her in any way. Beech claims the role of group leader, a nonexempt position, required leadership skills which are expected in management. Thus, while Adair's seniority and record of past performances qualified her in her field and are not disputed, these are only a few of the factors to be taken into account. Beech asserts there are other, more important factors to be considered, including the abilities to communicate, organize, and get along with others. Overall, Berry, and later Montgomery, were considered better qualified leaders than Adair.

In response, Adair argues Beech's asserted defenses are a pretext to unfairly justify its decisions. Adair claims that she is fully possessed of the necessary communicative, organizational, and interpersonal skills. Unlike other analysts, such as Berry and Montgomery, Adair has trained her colleagues, including Berry and Montgomery. In addition, in past years Adair has acted as group leader, and even the assistant manager, in the absence of those who normally filled the roles. No other analyst had fulfilled such duties.

Plaintiff claims that her supervisors' assessments, and now the complaints of others as to her leadership skills, are wholly self-serving, unfounded, and unfair.

Commencing November 12, 1991, this case was fully tried to the court. Upon completion of the trial, the court received the litigants' proposed findings of fact and conclusions of law. In addition, the court has fully reviewed the testimony, the transcript, trial notes and briefs. Oral arguments have been taken. Consistent with the comments and findings announced at the time of hearing, and for the reasons set forth below, the court finds for plaintiff Dixie Adair.

In reaching this decision, the court is sensitive to the fact that it is dealing with the decision-making process of management as it pertains to filling a management position. Selecting a group leader is one such function. Indeed, it appears from the company's practice that this position serves some, including Berry, as a "gateway" to more responsible management roles.

Additionally, the court is fully aware that certain leadership skills, including attitude, ability to communicate and listen, and the ability to otherwise get along with others, are important factors for this or any role in management.

The court is sensitive to the fact that in the employment selection process the manager's final selection is often a difficult "judgment" call, and trusting the process is fairly drawn, it should not be disturbed. For purposes here, it should be noted that in the court's view Berry is well qualified for the position he presently holds, as well as his past positions. He has served his company well and is perceived as an intelligent, articulate, aggressive, and well liked sort. The problem, however, is not with Berry; rather, the problem is that it was not his time for advancement. Another most deserving person, the plaintiff, did not receive the advancement for reasons

---

1. Janice Meredith, another analyst, similarly complained.

2. Montgomery was killed in a tornado disaster in April, 1991. The vacancy created by her death has remained unfilled to this date. Beech claims economic reasons have delayed a decision.

other than her qualifications, that is, because of her sex. In this regard, the court also understands that in acts of discriminatory practice, such conduct is seldom openly exercised and is rarely admitted. Moreover, such conduct is often quite subtle and quietly exercised. For an interesting and in-depth discussion regarding the evaluative process of management and how it is affected by notions of appropriate roles and traits of men and women, *see Sex, Stereotyping, and the Promotion of Women in Positions of Power*, 41 Hastings L.J. 471 (1990).

As with all other requisites, experience teaches that a trial judge must listen carefully, dig deep, and be sensitive to what may or may not have been said or done, all of which signals the basis for this decision. The court has listened attentively to the testimony of every witness, and for reasons set forth herein, has concluded that Adair was denied employment advancement by reason of the discriminatory mind set, sexual stereotyping, and actions of those responsible in the decision-making process.

### Findings of Fact

In reaching a decision, it is necessary to have a reasonable grasp of the employment setting in the parts and equipment department at Beech commencing with the late 1970s, and an introduction to some of the principals within.

Mr. Gary Jacks became manager of the parts and equipment department in February, 1988 and has served the department during all times material to the decisions made herein. It appears Jacks delegated ultimate decisions pertaining to employment upgrades to the person immediately responsible, i.e., assistant manager over the group leader or the analysts. His practice was to confer with the supervisor at the time of decision. Mr. Jacks impresses the court as a rather wiry, no nonsense sort, who expects his wishes to be complied with. In days past, he has been known to address female employees as "gals" and has invited some to his "lap". Jacks professes that with the advance of women's

rights these practices have changed. While it may be that the witness' outward mannerisms have changed, this court is not so certain that his demeaning views have changed, and it is likely they are known to others in management, including the person responsible for Berry's promotion.

Ed Boyd was the assistant manager of the department. He had served Beech from 1975 through 1987. In 1975, a crew chief vacancy occurred. This role was later designated as group leader. Adair temporarily held the position during the vacancy, and because of her qualifications was recommended for the upgrade. At that time, Charles Switzer, of Salina, Kansas, was promoted to the position because of his seniority. Adair, therefore, was not considered. The court notes that communicative skills, apparently, were not required credentials at that time.

Significant events transpired during the administration of Boyd and Switzer. To appreciate the significance of these events, it is necessary to know more about each of the individuals.

Boyd is perceived as an able, considerate and outspoken person. He has surely "said his mind" to Switzer or any others who happened to hear him. Boyd has some rather narrow views, some of which are drawn from deep-seated religious convictions. By example, "A woman's place is in the home." Additionally, he has expressed some purely racial and prejudicial views. These examples of individual beliefs and characteristics are reported not so much for their relevance as to this decision, but to further describe the environment in which Adair worked. Boyd is perceived by the court as a fair man. His own personal views, particularly as to the "woman's place," have not been shown to affect his employment judgments. Indeed, on many occasions during his own absence, but particularly by reason of Switzer's absence, Adair was readily called upon to assume authority and fill in. While Boyd believed Switzer was not a good group leader, in fact, Boyd and Adair got along well. Switzer knew this fact, and in the court's view, resented Adair. Certainly, no one in this

case has attested to Switzer's leadership skills or their importance to the group leader.

The court perceives Switzer as the complete opposite of Boyd. Indeed, if leadership skills are now claimed to be so important in the group leader role, then Switzer is a complete misfit. He appears to ·be quite introverted and reserved. The evidence indicates he is rather indecisive; the analysts were often inclined to bypass Switzer and go directly to Boyd for decisions. Additionally, there is evidence Switzer is short-tempered, at least to the extent that he has thrown a chair through his office wall, and that he is opinionated. In· the court's view, Switzer manifested his gender-related opinions through his actions in a manner not as subtle as Boyd's.

In the mid–'80s, Boyd and Switzer, having been in place for some years, both contemplated retirement in the next few years. Boyd left Beech in . September, 1987, and Switzer retired in May, 1989. Actually, Switzer vacated earlier by reason of his health, but he returned for a period of time. In any event, the concerns of Boyd and Switzer with regard to their replacements were evident to those who were privy to their inner counsel. In this time frame, Berry was summoned to Boyd's office for a conference which included Switzer. Following that conference, a complete turnaround in Berry's work habits was noticed by other employees. Now, Boyd and Switzer acknowledge they encouraged Berry to improve himself, with promotion in mind. To others, including the plaintiff and Karen Bender, a well-qualified analyst, it seemed Berry was being "groomed".

Bender is perceived as an objective and fair witness with much information to report. She is received as one of the most persuasive witnesses called to testify in this case. Bender testified that in the course of a luncheon walk with Berry he told her that he would be promoted. This was not denied. Bender further testified it was not uncommon for her to share in meetings between Boyd and Switzer. In one of these meetings, Switzer expressed his opinion on the qualifications of a group

leader and probable future assistant manager by stating, "We need a good man!" Bender queried Switzer, "What about one of us?" In response, Switzer simply rolled his eyes toward Boyd and said nothing. It was this singular event that signaled to Bender what would occur in the future and prompted her to seek a transfer out of the department.

The plaintiff has described the foregoing cast as the "good ole boy network." Without comment, the court will note . that it certainly is one from "another day" and hopefully the decision-made .here. will serve to change and/or formulate effective employment policies within the parts and equipment department.

As indicated, when Boyd retired in September 1987, Switzer moved to the post of assistant manager. Jacks suggested to Switzer that he put together a list of names and submit to him a choice for Switzer's successor. Switzer complied with the request and listed Adair, Montgomery, Berry and Meredith (listed here by seniority).

Switzer had at hand his own performance evaluations of each employee, made as recently as December, 1987. With regard to Adair, Switzer had rated her initiative as "superior". She was also thought to be superior in her knowledge of the job and her quantity of work. Adair's scores for such factors as judgment, attitude, quality and accuracy of work were "above average." No other prospect on Switzer's list was so highly regarded.

Jacks, Switzer and Nita Long, the company's EEO officer, contend the performance evaluations held no weight in selecting a group leader because they pertained only to the employees' roles as analysts, distinct from what is required of· a .group leader. They claim the factors addressed in the performance evaluations scarcely apply to the requirements of a group leader. The court notes,. however, the group leader position pays 60 cents more per hour than that of an analyst, but which, for the most part, is intended. to coordinate the activities of the analysts.

Finally, the court recognizes that while not a part of the decision-making process, it

was Boyd's view, given all that he knew of the parties involved and the several witnesses who testified here, that Adair was deserving of the upgrade to group leader, at least on a probationary period. Some credence is given to the fact that Boyd was surprised to hear that Adair was not elevated to the position of group leader.

### Conclusions of Law

■ In a Title VII action, the plaintiff must establish a *prima facie* case of disparate treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The burden is not onerous, but requires the plaintiff to prove by a preponderance of the evidence that she applied for an available position for which she was qualified and was rejected under circumstances which gave rise to an inference of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

In the instant case, Beech concedes that Adair has established a *prima facie* case of discrimination. Ignoring Adair's seniority and performance ratings, Switzer, in the absence of any company rules, policies or guidelines, without giving any notice of the vacancy or seeking application from anyone, and without following any objective criteria, made a wholly subjective judgment call. He selected Berry. This very event, of course, put in place a classic *prima facie* case of discriminatory practice in the workplace. To the surprise of no one, complaints were immediately filed by Adair and Meredith.

■ Upon establishing a *prima facie* case of disparate treatment, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. If the defendant sustains this burden, then the plaintiff must have an opportunity to prove by preponderance of the evidence that the legitimate reasons offered by the defendant were not the true reasons, but were a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

■ Beech contends Adair was not promoted to group leader because she lacked the interpersonal, leadership and communicative skills necessary for the position. For support, Beech points to complaints by other analysts concerning Adair and remarks by other employees who found Adair abrasive, patronizing and demeaning. Finally, to support its assertion that Adair was not promoted due to nondiscriminatory reasons, Beech relies on Switzer's testimony that Adair failed to take criticism well and was not a good leader.

Beech's articulated reasons for not promoting Adair to group leader can be categorized as subjective. The court, therefore, finds the following admonition pertinent:

> When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision should be subject to particularly close scrutiny by the trial judge.

*Royal v. Missouri Highway and Transportation Comm'n*, 655 F.2d 159, 164 (8th Cir.1981). With this principle in mind, the court makes the following observations.

Unbeknownst to anyone, Switzer quietly and privately put in place a written memo to himself (Ex. 9), wherein, after a decision was made and announced, he recorded the basis for his judgment. To his surprise, in the course of the discovery proceedings, Exhibit 9 surfaced. His comments are quite praiseworthy as to Berry and critical of Adair and Meredith. In the court's view, the only possible reason for Switzer to resort to this practice was not to refresh himself, but to justify in some written way, as if official, the basis for his reasoning. The court will not labor this opinion with notations within the memo except to conclude that Switzer's conclusions are unfounded, undeserved, and unfair both as to Adair and Meredith.

Furthermore, the court asserts a sense of disappointment with the mode in which plaintiff's complaint was received and processed by Long, Beech's EEO manager.

By example, she acquiesced in Switzer's comments found in Exhibit 9 as if they were probative and helpful. She expressed no concern that this entire decision-making process was akin to one person selecting a choice in a "personality contest." In fact, Long equated the selection process to just such a contest. Thus, given Long's perceptions, there is little chance the employment decision-making process at Beech will change in the future. In this case, Long rejected plaintiff's complaint out of hand. She reviewed Adair's request that Boyd or Bender be interviewed, but then conferred only with Jacks, Switzer, Berry and a host of analyst colleagues, as well as others. She was impressed with their respective versions detailing why Adair was not selected as group leader. The thrust of these interviews suggested that Jacks and Switzer's judgments were correct, and that plaintiff was an abrasive person, difficult to get along with, and a poor listener who took unkindly to criticism. Long was impressed with these interviews and stood with management. In the court's view, as previously indicated, the bases for the criticisms enumerated here are self-serving and unfounded. These arguments are rejected as being relative to management decisions.

Lastly, a further word about Adair. This person is about 61 years of age. She presented a neat, matronly appearance. She, too, is intelligent and articulate. Given the thrust of direct and cross-examination, she handled herself quite well. To be sure, she can handle herself. The evidence shows Adair can be tough and that she requires her colleagues to perform well. There is no confusion in her mind as to her role. She does not raise her voice, nor does she appear to be an emotional person easily swayed in her judgments. She has retained her poise and wit. The court notes the foregoing because, in the final analysis, the court is expected to accept the testimony and findings of Switzer, as he evaluated Adair, particularly with regard to her leadership skills. The court has listened carefully to both of them, and in the court's view, Adair has forgotten more about leadership skills than were ever known by Switzer, Jacks, and others. To accept the conclusion that somehow Adair's absence of leadership skills impacted on her qualifications to be upgraded to group leader is outrageous.

Indeed, the court believes there is another reason for Adair's failure to reach group leader which makes more sense. That reason is simply this: Switzer, clearly a follower, cannot bring himself to admit Adair into a management role. This man does not have the fortitude nor the will. Switzer is comfortable with his own kind; he makes no waves. Berry serves Beech well, and thus, in the end Beech felt it could ignore Adair. Surely, through the years plaintiff has made some enemies, and those persons were called upon when the need arose.

To accept the foregoing rationale, now found as fact, the decisions of Switzer and Jacks to deny Adair advancement as a group leader on March 1, 1988 were clearly gender based. Adair was wholly deserving of this appointment. What has not been said needs to be stated now. Through this entire process, Adair has served as a faithful, loyal employee. She has given her best to her employer. She is considered by everyone who knows her as a "work horse." She possesses the very essence of womanhood in the work place. This court is certain that these very traits worked to her disadvantage in the minds of Switzer and Jacks. In the court's view, as Adair is now to be upgraded to a role long overdue, she will serve Beech well.

IT IS ACCORDINGLY ORDERED this 28th day of January, 1992, that defendant Beech Aircraft Corporation upgrade Dixie Adair forthwith to the position of group leader within her department, and continue her in this role and compensate her in a sum commensurate with the present salary paid to a group leader.

It is further ordered that defendant Beech Aircraft Corporation pay to plaintiff Dixie Adair, in a lump sum, an amount equivalent to the sum paid to a group leader since March 1, 1988, less her earnings paid to date. This sum is to be paid within 30 days of the filing of this order.

A copy of this decision is to be delivered forthwith to the executive vice president of marketing at Beech. The court appreciates that circumstances may change, or that Adair in time may be found unsuitable for this role. If, after six months from the date of the filing of this order, the executive vice president of the marketing division of Beech expresses reasons for believing that plaintiff is not suitable for the group leader position, then that person shall report said reasons, along with support thereof, to this court. Further hearings will be considered under this circumstance.

In light of the foregoing findings, conclusions and directives, in the court's view no useful purpose will be served by addressing the plaintiff's claim for retaliation. The findings, conclusions and directives set forth herein provide a full remedy for plaintiff Adair.

Lastly, plaintiff's counsel is authorized to recover his attorney fees and costs. He is requested to submit a statement and supportive documents, including opinions if desired, and share said documents with counsel for defendant as to their reasonableness. In the event of a dispute or disagreement, defendant shall then prepare its response or objections.